# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

MARTIN K. EBY CONSTRUCTION
CO., INC.

          Plaintiff,

vs.                              Case No. 3:03-cv-41-J-32TEM

JACKSONVILLE TRANSPORTATION
AUTHORITY, a body politic and corporate,

          Defendant.

---

## ORDER

Before the Court is Defendant Jacksonville Transportation Authority's ("JTA's")
Motion For Attorneys' Fees And Costs (Doc. 172), brought pursuant to Section
768.79, Florida Statutes, Florida's Offer of Judgment statute[1], and Rule 54, Federal
Rules of Civil Procedure. Defendant JTA, an independent state agency that provides
transportation services for Duval County, Florida, prevailed at trial on all claims in this
bridge construction case brought by plaintiff, Martin K. Eby Construction Co., Inc.
("Eby"). (See Docs. 167, 168.) Before trial, pursuant to Section 768.79, JTA served

---

[1]    The provisions of Section 768.79 apply to state claims brought in federal
court. See McMahan v. Toto, 311 F.3d 1077, 1081 (11th Cir. 2002); Walker v.
Bozeman, 243 F. Supp.2d 1298, 1304 (N.D. Fla. 2003); Univ. Creek Assocs. II.
Ltd. v. Boston American Financial Group, 101 F. Supp.2d 1370, 1371 (S.D. Fla.
2000);.

1

on Eby a "Proposal for Settlement" and accompanying "Release" of Eby's claims in return for a payment by JTA of $1,500,000.  (Docs. 179-2, 179-3.)  JTA now seeks $587,060.00 in attorney fees and $332,577.28 in costs incurred subsequent to that offer.  (Doc. 172 at 6, 8, 11.)[2]  At issue is whether JTA's proposal for settlement and accompanying release unambiguously and with particularity put Eby on notice of the full ramifications of the proposed settlement, as required by Section 768.79.  A hearing was held on the motion on July 21, 2005.  (Doc. 194.)  The matter was then abated pending unsuccessful settlement negotiations.  Having now considered JTA's motion and memoranda of law and submissions, as well as Eby's responses and submissions (Docs. 172, 179, 180, 185, 191, 196, 198, 200, 201, 211, 212, 213); heard oral argument of counsel; and examined the Proposal for Settlement and Release at issue here, the Court is prepared to rule on the motion.

## I.    Background

### A.    Underlying Facts

This litigation involved a dispute arising from Eby's construction of 2.1 miles of highway and bridges forming part of the "Wonderwood Connector" in Jacksonville, Florida, providing much needed access between the City of Jacksonville and the beaches communities.  The Wonderwood Connector traverses marshland, a creek,

---

[2]    Pursuant to Rule 54, JTA also seeks $30,207.60 in costs incurred from the start of the action until the date of the proposal for settlement, May 18, 2004. (Doc. 172 at 10.)

called Greenfield Creek, the Intracoastal Waterway and Pablo Creek.  The facts of this case are comprehensively set forth in the Court's previous Findings of Fact and Conclusions of Law (Doc. 167) and are incorporated herein.  Only those facts necessary to decide this motion are repeated.

On February 21, 2001, the JTA received bids for the 2.1 mile four-lane portion of the project known as Wonderwood Connector Segment 2 ("Wonderwood 2") from Girvin Road on the west to Sandcastle Lane to the east of the Intracoastal Waterway and Pablo Creek.  (Doc. 24, ¶ 10; Doc. 167 at 24.)  As low bidder, Eby was awarded and entered into a  $36,887,852 general contract with JTA on April 27, 2001 ("Contract").  (Doc. 24, ¶¶ 9, 10; Doc. 76-1 at 2, 15; Doc. 167 at 3, 39.)  Though spanning a relatively short distance, the Wonderwood 2 engagement presented difficult challenges, including constructing two bridges, one approximately 1,400 feet long over Greenfield Creek, and a second bridge approximately 3,585 feet long spanning the Intracoastal Waterway and Pablo Creek, with low-lying wetlands in the approaches.  (Doc. 167 at 3-5, 24-25.)

Among the Contract's provisions was Addendum No. 2, which provided that the JTA could collect liquidated damages at the rate of $10,000 a day per calendar day for any failure by Eby to substantially complete the project in 805 days, or by July 16, 2003.  (See Docs. 167 at 63; 179-4.)  Additionally, the contract required Eby to achieve final completion by November 3, 2003; failure to meet this date entitled JTA

3

to assess liquidated damages at a rate of $3,000 per day.  (Ex. 21, Special Provision 8-10.2; Doc. 179-1 at 9.)[3]

Almost immediately, Eby recognized problems with the Contract, specifically with creating the temporary access structures needed to construct the Greenfield Creek and Intracoastal Waterway spans.  Because the soil approaching Greenfield Creek was much softer and less stable than Eby anticipated, it was required to make significant modifications to the temporary dirt haul road and "fingers" (dirt platforms) (see Doc. 167 at 9) necessary to sustain the heavy equipment required to construct the bridge over Greenfield Creek.  (Doc. 167 at 47.)  Construction was authorized to begin on May 3, 2001, and the soft soil issues arose within days, as site clearing equipment became unstable and mired in soft soil.  (Id.)

On June 22, 2001, Eby provided written notice to JTA of these unanticipated constructability issues and required soft soil modifications associated with the temporary structures for the Greenfield Creek bridge construction.  (Docs. 24 ¶ 18; 167 at 49-50.)  JTA took the position that the contractor was responsible for designing the temporary access roads and that the cost thereof was included in the Contract price.  (See Doc. 167 at 52.)  Throughout the summer of 2001, the parties attempted to resolve who was responsible for the increased costs caused by the soft soil issues,

---

[3]     The parties dispute whether the amount for liquidated damages related to substantial completion and final completion ($10,000 per day and $3,000 per day, respectively) are additive.  (See Doc. 179-1 at 9 n.6.)

but to no avail.  Eby modified the temporary structure design and continued construction (Docs. 24, ¶¶ 18-21; 167 at 49-53.)   By letter dated August 14, 2001, Eby reiterated its need for additional money and time to work through the challenges in constructing the temporary approach structures.  (Docs. 24,  ¶ 21, 24; 167 at 53, 57.)

Subsequently, more problems arose in Eby's construction of the larger bridge over the Intracoastal Waterway and Pablo Creek.  As with the first bridge, bridge construction over Pablo Creek also required a temporary platform to support construction equipment.  In the fall of 2001, Eby, with JTA's concurrence, modified the temporary access construction to the Pablo Creek bridge.  (Doc. 167 at 53-56.)  For this portion of the project, Eby explored dredging the small island between the Intracoastal Waterway and Pablo Creek, and moving construction barges into Pablo Creek through the newly created channel.  (Doc. 167 at 54.)   On September 28, 2001,  Eby corresponded with the JTA regarding the need for Eby to adjust its soft soil work plan as a result of the subsurface material beneath the location of the temporary structures needed to build a section of the bridge across Pablo Creek, (Docs. 24, ¶ 22; 167 at 55), which was approved by the JTA.  (Doc.167 at 56.)

On March 13, 2002, JTA's consultant responded to Eby's August 14, 2001 letter regarding responsibility for what Eby deemed to be extra work necessary for the dirt haul roads and fingers, saying he could not recommend JTA agree to Eby's

request for additional money or time to complete the project.  (Doc. 167 at 57.)  In April 2002, Eby submitted a Request for an Equitable Adjustment ("REA") to the JTA, asking for $2,687,410.10 in additional compensation and an 81-day contract extension time for the additional cost and time associated with the temporary dirt haul roads for the Greenfield Creek bridge construction, and including $65,000 to cover the cost of dredging access to the Pablo Creek bridge construction site.  On October 31, 2002, Eby revised its REA for the soft soil modifications to $2,162,027.  (Docs. 24, ¶ 25; 167 at 58.)

Meanwhile, Eby moved forward with the Pablo Creek dredging project.  By January 2003, because of numerous problems associated with the construction of the bridge over Pablo Creek, Eby had allegedly already amassed $1,000,000 in "marine inefficiency" costs in the Pablo Creek approach.  (Doc. 167 at 61 (citing (Ex. 91).)  Eby's August 2003 internal management report indicated that "[s]ignificant additional costs have and will be included due to this marine based construction [at Pablo Creek].  We anticipate submitting this claim by October 1, 2003."  (Ex. 331; see Doc. 167 at 3.)  The report also indicated that "[l]iquidated damages began assessing by JTA on July 17, 2003 at $10K a day for substantial completion.  We have and will ask for additional time with our soft soil and Pablo Creek claims that should extend the contract durations after November 4, 2003 [the contract's final completion date]."  (Doc. 167 at 63 (citing Ex. 331).)

6

The anticipated liquidated damages claim came shortly thereafter. On September 9, 2003, JTA, by letter, informed Eby that it intended to collect liquidated damages commencing as of July 16, 2003, at the rate of $10,000 a day, pursuant to Addendum No. 2 to the Contract, and that "the JTA will deduct liquidated damages at the end of the project from Eby's security/retainage." (Docs. 179-4; 179-5 at 9.)

On October 15, 2003, Eby submitted an REA associated with the Pablo Creek marine construction work, seeking a contract adjustment of $7,707,702.68 plus a time extension of 207 calendar days. (See Doc. 24, ¶¶ 7, 26; Doc. 167 at 63.)

The total time extension requested by Eby in the REA's for the soft soil and Pablo Creek claims was 299 days, of which 278 days were compensable and 22 days were excusable (but not compensable). (See Doc. 212 at 3.). Meanwhile, JTA was accumulating liquidated damages at a rate of $10,000 per day, beginning July 16, 2003. However, under the Contract, each compensable or excusable day of time recovered by Eby would preclude JTA from assessing liquidated damages for that day. Restated, for each day of contract extension that Eby was requesting, JTA had a potential corresponding competing claim for liquidated damages in the amount of $10,000.

By September 2003, JTA issued a temporary stop-work order as a result of design problems with the main span bridge over the Intracoastal Waterway. On April 7, 2004, Eby submitted a new REA entitled "Main Span Design Error" in the amount

7

of $3,343,854.50.  (<u>See</u> Doc. 179-3 at 3; <u>Martin K. Eby Constr. Co. v. Jacksonville</u>

<u>Transportation Authority</u>, 3:04-CV-1234-J-TJC-MCR (M.D.Fla.)("<u>Eby II</u>"),  Doc. 3, ¶

10; Doc. 18, ¶ 10.)

Work resumed, and on September 3, 2004, JTA agreed that Eby had

substantially completed construction of the Wonderwood Segment 2.  JTA disbursed

$1,835,000 to Eby from Eby's security/retainage fund held in escrow by JTA,

withholding only $100,000.  (Doc. 179-6.)  Eby revised its main span REA on

September 15, 2004, to $3,453,007,91 (prior to crediting the $1 million advanced by

JTA).  (<u>See</u> <u>Eby II</u>, Doc. 3, ¶ 11; Doc. 18, ¶11.)

## B.   **Procedural History**

Interwoven with the facts of the construction project, are the concurrent

proceedings in this case and in the related case, <u>Martin K. Eby Constr. Co. v.</u>

<u>Jacksonville Transportation Authority</u>, 3:04-CV-1234-J-TJC-MCR (M.D.Fla. filed Nov.

24, 2004)("<u>Eby II</u>" or "main span case").[4]

> 1.   *Temporary Access Roads and Pablo Creek*
> *Marine Construction Claims;*
> *<u>Martin K. Eby Construction Co. v. JTA</u>, 3:03-*
> *cv-41-J--32TEM*

On January 21, 2003, long before the project was completed, but well after

---

[4]   The parties cite freely to <u>Eby II</u>, the so-called "Main Span" case, and indeed,
the Release at issue here makes reference to the underlying claim in <u>Eby II</u>.  (<u>See</u>
Doc. 179-3 at 3.)  Accordingly, the Court takes judicial notice of <u>Eby II</u>.  <u>See</u> <u>Bryant</u>
<u>v. Avado Brands, Inc.</u>, 187 F.3d 1271, 1279 (11th Cir. 1999); Fed. R. Enid. 201.

trouble had arisen, Eby filed a Complaint in this case ("<u>Eby I</u>").  (<u>See</u> Doc. 1.)  The subject of the initial Complaint was "a claim by EBY for an increase in the contract amount of $2,162,027.00, and an appropriate time extension, associated with soft soil modifications to temporary structures constructed by EBY as Part of the Project," in connection with the bridge over Greenfield Creek.  (Doc. 1,  ¶¶ 6, 7.)  Eby's four-count Complaint against JTA alleged differing site conditions; breach of contract; superior knowledge and constructability claims.   Eby alleged it was entitled to $2,162,027, plus interest, pursuant to the Contract, and, "[p]ursuant to the differing site conditions clause at Supplemental Specification 4-3.7, defendant JTA is required to increase the cost and time required for performance and to modify the contract in writing."  (Doc. 1, ¶ 28-29.)

On November 18, 2003, a month after informing JTA by REA of its Pablo Creek marine construction claim, Eby filed a First Amended and Supplemental Complaint, adding a second separate claim related to the Pablo Creek crossing, as set forth in its October 2003 Pablo Creek marine construction REA.  (Docs. 24, ¶ 4; 167 at 63.) Eby alleged that

> By transmittal of October 15, 2003, Serial Letter 179, Eby submitted its request for equitable adjustment associated with the Pablo Creek Marine construction work.   This request for equitable adjustment seeks a contract adjustment of $7,727,702, plus a contract extension of two hundred seven (207) calendar days (299 calendar days less 11 days for weather, and less 81 days submitted in the previous request for equitable adjustment for the soft soil

9

modifications).  (Doc. 24, ¶ 26.)

Eby alleged that JTA had breached the contract "by failing to pay for extra work and by failing to extend the contract time as required to perform the extra work associated with the temporary structures."  (Doc. 24, ¶ 36.)  Eby sought $2,162,027 for the soft soil modification claim, and $7,270,702.68 for the Pablo Creek Crossing claim, plus prejudgment interest (Doc. 24, ¶¶ 34, 38, 41, 45), and "other and further relief as the Court deems just and appropriate."  (Doc. 24 at 14.)

Eby noted in the amended complaint that it had encountered a "very serious problem" with regard to the beam deflection of the main span, but that "the magnitude of the cost and time impact of the beam deflection of the main span over the [Intracoastal] ha[d] not been determined."  Eby reserved the right to bring that additional claim related to the main span at a later date.  (Doc. 24, ¶ 8.)

On November 26, 2003, JTA answered, denying Eby's allegations, and asserting its affirmative defenses.  (Doc. 25.)  In response to Eby's allegations that JTA breached the contract by not affording additional time to complete the contract components, JTA did not assert an affirmative defense or a counterclaim seeking liquidated damages for delay, though it had previously put Eby on written notice of its intent to collect liquidated damages.  At this point in time, Eby had failed to meet the "substantial completion" July 16, 2003 deadline and was also past the November 3, 2003 final completion deadline, and construction was still underway.

2.   *JTA's Proposal for Settlement and Release*[5]

On May 18, 2004, JTA served the Proposal for Settlement which is the subject

of this motion.  As described by JTA itself, its Proposal for Settlement "proposed to

settle the claims asserted in this action and which could have been asserted in this

action for $1,500,000." (Doc. 172 at 1.)[6]

JTA's offer consisted of two documents, a Proposal for Settlement and a

Release.  (Docs. 179-2, 179-3.)   Relevant to whether JTA's offer is clear and

unambiguous, are the following provisions in the Proposal for Settlement:

**B.**   **Claims that Proposal Attempts to Resolve**

> This proposal is being offered in an attempt to
> resolve the claims asserted by EBY against JTA regarding
> the Contract that is the subject of this litigation and as is
> more fully set forth in the release attached as **Exhibit A**.

---

[5]    The terms "proposal for settlement", "offer of judgment", "demand for judgment", and "proposal for judgment" are used interchangeably by litigants, courts, and the Florida Legislature.  Section 768.79, Florida Statutes, is entitled "Offer of judgment and demand for judgment."  The related Florida Rule of Civil Procedure, Rule 1.442, addresses "proposals for settlement."  Rule 1.442 "applies to all proposals for settlement authorized by Florida law, regardless of the terms used to refer to such offers, demands, or proposals."  Fla. R. Civ. P. 1.442(a).  JTA termed its proposal made pursuant to Section 768.79, a "proposal for settlement." (Doc. 179-2.)

[6]    See also Doc. 172 at 3-4 ("JTA made an offer of judgment . . . wherein JTA offered to pay Eby $1,500,000.00 in exchange for a release of all claims asserted or which could have been asserted in this action against JTA regarding the Wonderwood Project that was the subject of this action").

### C.    Relevant Conditions

JTA will pay EBY a lump-sum amount of One Million, Five Hundred Thousand and 00/100 Dollars ($1,500,000.00), and EBY will dismiss this action with prejudice.  In addition, EBY shall execute the release, a copy of which is attached hereto as **Exhibit A**, . . .. Should this proposal be accepted, the parties shall bear their respective attorneys' fees and costs incurred in this action.

### D.    The Total Amount of the Proposal

In addition to the non-monetary obligations set forth above, JTA agrees to pay EBY a lump sum amount of One Million, Five Hundred Thousand and 00/100 ($1,500,000.00).  (Doc. 179-2.)

The proposed Release to be executed by Eby in favor of JTA , attached as Exhibit

A to the Proposal for Settlement, provided:

### I.    <u>EBY Release</u>

In consideration of the payment of $1,500,000 made by JTA to EBY pursuant to a Proposal for Settlement in the Litigation and except for the excluded claim set forth in section II hereof, EBY, for itself, its heirs, representatives, parent corporations, subsidiaries, affiliates, present and former officers, directors, shareholders, present and former employees, agents, servants, successors, predecessors, legal representatives and assigns, hereby waives, releases and forever discharges JTA, including its board, employees and agents from any and all Contract Claims (as the term "Contract Claim" is defined in the special provisions to the

12

Contract, page 1-1)[7] that EBY asserted or could have asserted against JTA under the Contract from the beginning of time through the date of this Release, including but not limited to the following Contract Claims:

(1)     April 24, 2002, temporary access roads/request for equitable adjustment, identified as Deposition Exhibit No. 2 in the Litigation and including Bates page ranges REA-(Temp) 00001-00275.

(2)     October 15, 2003, Pablo Creek marine construction work request for equitable adjustment identified as Deposition Exhibit No. 3 in the Litigation and including Bates page ranges REA-(Pablo) 00001-00364.

(3)     EBY's claim for SEAL concrete as contained in EBY's letters of September 19, 2002 (EBY Serial Letter No. 42113.1.5.147), June 5, 2002 letter (EBY Serial Letter No. 42113.1.50.120), and October 18, 2001 letter (EBY Serial Letter No. 42113.1.5.061).

## II.     Excluded Claim

This Release provided by EBY to the JTA herein does not include and specifically excludes EBY's Request for Equitable Adjustment titled "Main Span Design Error" submitted by EBY to Reynolds, Smith & Hills on April 7, 2004.

_____

[7]     The special provisions of the Contract defines "Contract Claim" as:

A written demand submitted to the Authority by the Contractor . . . seeking additional monetary compensation, time, or other adjustments to the Contract, the entitlement or impact of which is disputed by the Authority.  (Doc. 211 at 3.)

13

### III.   Dismissal With Prejudice

EBY shall dismiss with prejudice, if it has not already done so, the Litigation, *Case No. 3:03-CV-41-J-32-TEM*. (Doc. 179-3.)

On May 18, 2004, the date of JTA's Proposal for Settlement, Eby had still not yet achieved substantial completion of the project, meaning that JTA's pending Addendum No. 2 "substantial completion" claim for liquidated damages at a rate of $10,000 a day, was up to 307 calendar days, while the Provision 8-10.2 "final completion" $3,000 a day claim was at approximately 197 days and both still counting.

Eby rejected the offer by not responding to it within thirty days.  <u>See</u> §768.79(1), Fla. Stat. By this time, JTA's "substantial completion" liquidated damages claim amounted to approximately $3.3 million, and its "final completion" liquidated damages claim was approximately $591,000.  (<u>See</u> Doc. 179-1 at 9.)  The project was substantially completed on September 3, 2004.

After conducting a nine-day bench trial in December 2004, the Court, on March 21, 2005, entered its Findings of Fact and Conclusions of Law (Doc. 167) and subsequent Judgment (Doc. 168) in favor of JTA and against Eby on all claims asserted by Eby regarding the temporary access roads and Pablo Creek marine construction claims.  The Eleventh Circuit Court of Appeals has now affirmed this

14

judgment. <u>Martin K. Eby Construction Co. v. JTA</u>, No. 05-12136, 2006 WL 1117952 (11th Cir. April 26, 2006).

> 3.  *Main Span Claim ("<u>Eby II</u>")*
>      <u>*Eby v. JTA, 3:04-CV-1234-J-32MCR*</u>

On November 24, 2004, six months after Eby rejected JTA's Proposal for Settlement in this case, and 10 weeks after substantial completion of the project, Eby filed its anticipated "Main Span" claim against JTA. (<u>Eby II</u>, Doc. 3.)  That claim arose out of an alleged design error which resulted in the discovery, as the project was nearing completion, that insufficient clearance existed between the underside of the main span of the Intracoastal Waterway bridge and the water level of the Intracoastal Waterway. (<u>Eby II</u>, Doc. 3, ¶¶ 7, 8.)  As a result of the JTA's stop work order on the bridge project, "on or about September 12, 2003, Eby notified JTA that Eby was seeking additional time and compensation due to the design error associated with the Main Span of the ICW [Intracoastal Waterway] Bridge." (<u>Eby II</u>, Doc. 3, ¶ 8; Doc. 18, ¶ 8.)  Eby's Main Span claim, which is currently pending, seeks damages from JTA in the amount of $3,453,007.91 (less an advance by JTA of $1 million). (<u>Eby II</u>, Doc. 3, ¶ 11.)

In its  April 18, 2005 answer,  JTA denied the substantive allegations of the Main Span Complaint and asserted eight affirmative defenses, including

## **Seventh Affirmative Defense**

> 30.   JTA is entitled to a setoff against Eby's claim for liquidated damages for delays incurred due to Eby's failure to complete the project on time and for other contractual adjustments to the contract. (<u>Eby II</u>, Doc. 18 at 6.)

JTA also counterclaimed against Eby for liquidated damages in the amount of $10,000 a day, as provided by Addendum No. 2 of the Contract, alleging that Eby substantially completed the project on July 20, 2004, 369 days past the contractual substantial completion date of July 16, 2003.  JTA seeks an additional $3,000 a day in liquidated damages for missing the final completion deadline by 274 days.  (<u>Eby II</u>, Doc. 18, ¶¶ 35-52.)  JTA asserted in its counterclaim that it "has made an initial adjustment to liquidated damages based upon the Main Span redesign but reserves the right to further adjust such amount based upon information obtained through discovery and further analysis."  (<u>Eby II</u>, Doc. 18, ¶ 44.)

## II.   **Legal Principles**

Under Section 768.79(1), Florida Statutes, a defendant is entitled to recover costs and fees "if a defendant files an offer of judgment which is not accepted" within 30 days, and "if the judgment is one of no liability or the judgment obtained by the plaintiff is at least 25 percent less than such offer. . .."  <u>Pinchinat v. Graco Children's Products, Inc.</u>, 2005 WL 1459409 at * 1 (M.D. Fla. 2005); § 768.79(1), Fla. Stat. Thus, the defendant will be entitled to attorneys' fees from the date of the offer if the

16

plaintiff fails to recover at least 75% of the amount of the proposal, providing the offer complies with the governing technical requirements.  The burden is on the offeror to show that it is entitled to fees.  <u>Official Cargo Transportation Co. v. Certain Interested Underwriters</u>, 368 F. Supp.2d 1314, 1316-17 (S.D. Fla. 2005).

To satisfy the technical requirements of Section 768.79, an offer must, *inter alia*, "(d) State its total amount." § 768.79(2)(d), Fla. Stat.  Additionally, "[t]he offer shall be construed as including all damages which may be awarded in a final judgment." § 768.79(2), Fla. Stat.

Federal courts construing offers made pursuant to Section 768.79 consider the requirements of Florida Rule of Civil Procedure 1.442, which prescribes "Form and Content of Proposal for Settlement." Fla. R. Civ. P. 1.442(c).  <u>See</u> <u>McMahan v. Toto</u>, 311 F.3d 1077, 1082 (11th Cir. 2002).[8] The intent and underlying policy of Rule 1.442 is "'to terminate all claims, end disputes, and obviate the need for further intervention of the judicial process.'" <u>In re Auffant</u>, 274 B.R. 554, 557 (Bankr. M.D. Fla. 2002)(quoting <u>Unicare Health Faciities, Inc. v. Mort</u>, 553 So.2d 159, 161 (Fla. 1989)).

Rule 1.442 requires great detail in settlement proposals for the purpose of enabling "parties to focus with greater specificity in their negotiations and thereby

---

[8]     "Rule 1.442 implements section 768.79 . . .."  <u>1 Nation Technology Corp. v. A1 Teletronics, Inc.</u>, 924 So.2d 3, 5 (Fla. 2nd DCA 2005).  The parties agree that Rule 1.442 is applicable to the Court's analysis of JTA's proposal for settlement. (<u>See</u> Docs. 172 at 4, 179-1 at 3 n.2, and 4, 185 at 2.)

facilitate more settlements and less litigation." MGR Equip. Corp. v. Wilson Ice Enterprises, Inc. , 731 So.2d 1262, 1264 n.2 (Fla. 1999).   Under Rule 1.442, a proposal for settlement shall *inter alia*:

. . .

> (B)   identify the claim or claims the proposal is attempting to resolve;
> (C)   state with particularity any relevant conditions;
> (D)   state the total amount of the proposal and state with particularity all nonmonetary terms in the proposal;

. . .

Fla. R. Civ. P. 1.442(c)(2)(B)-(D).

The purpose of the offer of judgment mechanism is to "'terminate all claims, end disputes, and obviate the need for further intervention of the judicial process' by encouraging parties to exercise their 'organic right ... to contract a settlement, which by definition concludes all claims unless the contract of settlement specifies otherwise.'" Dictiomatic, Inc. v. USF&G, 127 F. Supp.2d 1239, 1244 (S.D. Fla. 1999)(quoting Unicare Health Facilities, Inc. v. Mort, 553 So.2d 159, 161 (Fla. 1989)). However, because offers of judgment are punitive in nature and in derogation of the common law rule that each party pay its own attorney's fees, they must be strictly construed. RLS Business Ventures, Inc. v. Second Chance Wholesale, Inc., 784 So.2d 1194, 1197 (Fla. 2d DCA 2001).  Additionally, because the statute is, in effect, a punitive measure, sanctioning an offeree who does not timely accept a settlement offer made prior to trial, a proposal to settle made pursuant to this procedure "should

18

be construed in favor of the party to be sanctioned." Hibbard v. McGraw, 918 So.2d 967, 971 (Fla. 5ᵗʰ DCA 2005).

One of the most difficult aspects of the offer of judgment process is ensuring that an offer or proposal to settle contemplates all contingencies, identifies all claims to be resolved, states with particularity all conditions and nonmonetary terms, and states the total amount of the proposal. §768.79(2), Fla. Stat.; Fla. R. Civ. P. 1.442(2). See  State Farm Mut. Auto. Ins. Co. v. Nichols, No. SC03-1483, 2006 WL 1491542, at * 9 (Fla. June 1, 2006)(citation omitted).  "'The rule intends for a proposal for judgment to be as specific as possible, leaving no ambiguities so that the recipient can fully evaluate its terms and conditions.  Furthermore, if accepted, the proposal should be capable of execution without the need for judicial interpretation.  Proposals for settlement are intended to end judicial labor, not create more.'" Nichols, 2006 WL 1491542, at * 10 (citation omitted).

The Florida Supreme Court, in State Farm Mut. Auto. Ins. Co. v. Nichols, 2006 WL 1491542, at * 9, recently reaffirmed Florida courts' expectation that offers of judgment and proposals for settlement be stated with unambiguous particularity as to whether they reach all claims pending between the parties.  Its reasoning is particularly applicable here.  In Nichols, an insured was seeking personal injury protection (PIP) benefits from its insurer, State Farm.  The insured also had pending an uninsured motorist (UM) claim in a separate suit against State Farm.  Both claims

19

arose out of the same automobile accident. In the PIP action, the Florida Supreme Court invalidated a proposal for settlement made by State Farm to the plaintiff that included a release of all claims that were brought or were required to have been brought. The proposal was insufficient because of the possibility that acceptance of the proposal would have extinguished the insured's pending UM claim. Nichols, 2006 WL 1491542, at * 9, 11.

In so holding, the Court first concluded that the proposed release accompanying State Farm's proposal for settlement constituted a condition or nonmonetary term that must be described with particularity. Nichols, 2006 WL 1491542, at * 10. Recognizing that releases traditionally have expansive language, the Florida Supreme Court stated that Rule 1.442 "aims to prevent ambiguity, not breadth." Nichols, 2006 WL 1491542, at * 10. The rule "merely requires that the settlement proposal be sufficiently clear and definite to allow the offeree to make an informed decision without needing clarification. If ambiguity within the proposal could reasonably affect the offeree's decision, the proposal will not satisfy the particularity requirement." Nichols, 2006 WL 1491542, at * 10.

In Nichols, the defendant State Farm's proposal for settlement stated that acceptance thereof would constitute full and final settlement of all claims "arising out of the above-styled case," and the accompanying release provided that all claims which had accrued to date would be settled. Though the plaintiff's concurrently

20

pending UM claim was not technically "in" the "above-styled case," but was rather a separate action, it could have been viewed as "arising out of . . . the above-styled case" because it arose from the same set of facts and had accrued. Nichols, 2006 WL 1491542, at * 11. However, State Farm's proposal for settlement and release did not specifically state whether the plaintiff's pending UM claim would be extinguished by acceptance of the proposal for settlement and release. Id. In invalidating the proposal, the Court stated: "settlement proposals must clarify which of an offeree's outstanding claims against the offeror will be extinguished by any proposed release." Nichols, 2006 WL 1491542, at * 11.

Also relevant is the reasoning in Connell v. Floyd, 866 So.2d 90 (Fla. 1st DCA), rev. denied, 880 So.2d 1210 (Fla. 2004).  In Connell, defendants proposed to settle plaintiff's claims against them for $1.00, but as a condition of that settlement, required plaintiff to stipulate that defendants prevailed in defense of plaintiff's claims.  866 So.2d at 92.  Significantly, defendants retained their counterclaims against the plaintiff.  Id.  The court held that a final judgment based upon the settlement terms might have been admissible in the litigation of the remaining counterclaims "and most likely would have eviscerated the [plaintiff's] defense(s) thereto." Connell, 866 So.2d at 92. "Because the potential ramifications of the proposed final judgment condition did not simply place the [plaintiff] in the position of having to make a hard choice, but rather, rendered him unable to evaluate what his choices were, . . . the proposal was

21

invalid."  Connell, 866 So.2d at 92.

Similarly, in Palm Beach Polo Holdings, Inc. v. Village of Wellington, 904 So.2d

652 (Fla. 4th DCA 2005), the court, relying upon the Fifth DCA's now-affirmed ruling

in Nichols, held that a proposal for settlement, accompanied by a general release that

required plaintiff to release any cause '"including, but not limited to, . . . items of

damage or loss which were brought or not brought in [this] lawsuit,'" 904 So.2d at 653

(emphasis omitted), failed to meet the particularity requirements of Section 768.79

and Rule 1.442.  The court said that the proposal could be read to extinguish

plaintiff's claims pending in other lawsuits between the parties.  Again, "[t]he meaning

of the proposal [was] ambiguous and would require construction by a court.

Acceptance could cause plaintiff to relinquish a claim that it would not otherwise have

done."  Palm Beach Polo Holdings, Inc., 904 So.2d at 654.  Accord Dryden v.

Pedemonti, 910 So.2d 854 (Fla. 5th DCA 2005)(where parties' attorneys in a personal

injury automobile accident case disagreed at oral argument whether proposal for

settlement with release of "all claims" in connection with the incident would potentially

extinguish plaintiff's first party PIP and health insurance claims, the proposal was

ambiguous and invalid).  See also RLS Business Ventures, Inc., 784 So.2d at 1197

(proposal "did not specifically state which of the pending claims were covered by the

proposal" because it was "silent concerning the outcome of the replevin counts and

who would retain possession of the items sought under them"); Bayley Products, Inc.

22

v. Cole, 720 So.2d 550, 551 (Fla. 4th DCA 1998)(offer addressed only two of the four counts asserted by the counterclaim and did not address issue of entitlement to funds paid into the court's registry).

## III.   Discussion

Eby argues that it would have been "ill-advised for Eby to abandon its claims for monetary compensation and for a contract extension in exchange for $1,500,000, when such a decision had undefined consequences and would leave it unprotected against a claim for liquidated damages in excess of $3.3 million." (Doc. 179-1 at 10-11.)  It also argues that if, as JTA now contends, JTA's proposal did not include any time extensions, then it was a "litigation trap" made in bad faith to secure a waiver of a portion of Eby's defense against the $3.3 million liquidated damages claim.  (Docs. 279-1 at 15; 191 at 5.)   Eby contends the Proposal is unclear as to the time component of Eby's claims, and to be clear, the Proposal should have specifically stated whether it included any days of contract extension.  (Doc. 191 at 3.)

JTA characterizes Eby's argument as "strained," (Doc. 185 at 1), and replies that the "Proposal for Settlement carefully describes the claims to be resolved, [and] details all relevant monetary and non-monetary conditions."  (Doc. 185 at 2.) "It expressly addresses each of the claims brought by Eby and offers to settle them for a total of $1,500,000 . . . whether as to time money or anything else" with respect to the designated REAs.  (Doc. 185 at 3.)  JTA asserts it had no obligation to recognize

23

days or delay and concomitant expenses in calculating its Proposal, inasmuch as Eby

sought "one form of relief - money" damages in its Complaint and Amended

Complaint, and sought no declaratory judgment that it be granted any delay days or

that a future liquidated damages claim for those days be declared invalid.  (Doc. 185

at 5.)     JTA contends that the Proposal provides for dismissal and release of those

claims on the table in this lawsuit, "directly address[ing] Eby's claim for damages,"

and that there was no counterclaim for liquidated damages pled or otherwise to be

addressed by the Proposal (Doc. 185 at 4, 6):

> JTA's Proposal thus directly addresses Eby's <u>claim for damages</u>, offering $1,500,000 in return for a dismissal of those claims and a release that both explicitly described the claims being released and those not being released.  Given the *res judicata* effect of such a dismissal is determined by reference to the settlement, JTA left no doubt as to what Eby would give up in return for $1,500,000 and what Eby would retain.  <u>See e.g.</u> <u>Norfolk Southern Corp. v. Chevron USA, Inc.</u>, 371 F.3d 1285, 1289 (11th Cir. 2004).  (Doc. 185 at 4)(emphasis added).)

JTA later expanded its characterization of Eby's claims covered by its proposal

to include "Eby's requests for additional time."  (Doc. 201 at 2; <u>see also</u> Doc. 201 at

4 ("JTA was willing to pay Eby $1.5 million dollars for dismissal of the action with

prejudice and a release of Eby's Contract Claims that included Eby's claims for time

that were tried before this Court.").)    However, at the same time, JTA asserted that

JTA's "LDs [liquidated damages] claim could not have been resolved in this action,

as it is contingent on the resolution of Eby's separate main span claim that is pending

24

before this court in a separate action."  (Doc. 201 at 3.)

At oral argument on this motion, counsel for JTA stated that its Proposal for Settlement was not ambiguous with respect to Eby's claim for additional time and that had Eby accepted JTA's $1.5 million Proposal for Settlement, Eby not only would have given up its claim for additional compensable and excusable time credit, it would have been precluded from "re-litigating" the time issue with respect to its problems with the soft soil at Greenfield Creek and the Pablo Creek marine construction as a defense to JTA's liquidated damages counterclaim brought in the 2004 separate main span case.  JTA bases this argument on the fact that the Release makes reference to the specific REA's and "says those REA's are gone."

More recently, JTA contends that "JTA's offer clearly and unambiguously provided for the release of Eby's time and extra compensation claims that were part of this action."  (Doc. 213 at 5.)  Citing 1 Nation Technology Corp. v. A1 Teletronics, Inc., 924 So.2d 3 (Fla. 2nd DCA 2005) and the definition of "Contract Claim" which contemplates claims for time, JTA now argues that "the offer unambiguously required Eby to release its claims for time asserted in this action," and that "[e]ven if the request for time had not been specifically addressed, the release would have included Eby's claim for time [because] [a] release of all claims in the litigation includes claims not mentioned but [that are] part of the action."  (Doc. 213 at 1).  JTA argues that by referring to "Contract Claims" as defined, it "made clear" in its proposal and release

25

"that JTA was granting none of Eby's requests for time."  (Doc. 213 at 2.)[9]

JTA's position on the meaning and scope of its Proposal seems to have evolved over time.  However, JTA's current position on the scope of its Proposal would have required Eby, as offeree, to read much into the face of the Proposal and Release to divine their full ramifactions now described by JTA.  The Release attached to JTA's Proposal for Settlement, provided that in return for payment of $1.5 million, Eby would release JTA from "<u>any and all Contract Claims</u>", as defined, "that Eby asserted or could have asserted" against JTA under the Contract, "including but not limited to" the three claims listed, as embodied in the specific REA's (and specifically excluding Eby's main span claim).  <u>See</u> <u>Palm Beach Polo Holdings, Inc.</u>, 904 So.2d at 653 (ambiguous proposal sought release of actions "including but not limited to" those brought or not brought).  Nowhere does the May 18, 2004 Proposal or Release make clear that by accepting the offer, Eby would also be waiving its defense to all or part of JTA's liquidated damages claim that had begun to accrue July 16, 2003, ten months earlier.

_____

[9]     While the parties disagree about whether JTA's claim for liquidated damages was a compulsory counterclaim in this action, both parties agree that it was an existing claim at the time of the Proposal for Settlement in May 2004, and that the Court need not resolve the compulsory counterclaim question here.  (<u>See</u> Docs. 191 at 4, 201 at 5.)  The Court agrees that there is no need to make that determination in the context of this motion.  Accordingly, the Court expresses no opinion whether JTA's claim for liquidated damages was a compulsory counterclaim in this case and makes no other determination concerning the liquidated damages issue.

By not specifying whether the Proposal or Release contemplated the excusable or compensable time sought by Eby, JTA rendered Eby unable to fairly evaluate the nonmonetary terms of the Proposal.  JTA made a lump sum offer of $1.5 million to settle "all Contract Claims" specified.  But, the Proposal does not specify whether any of that lump sum payment is for compensable days sought by Eby's claims, nor does it address Eby's claim for excusable days or JTA's claim for liquidated damages.

The Court is not persuaded that the decision in 1 Nation Technology Corp. v. A1 Teletronics, supra, cited by JTA, (Doc. 213 at 1), dictates a different result.  In 1 Nation Technology Corp., a tortious interference with employment contract and business relationship case,  the court, in *dicta*, stated that the defendant's offer of judgment "'to resolve all claims that are or may be made by the Plaintiff against all Defendants in this action arising out of the incident or incidents that gave rise to Plaintiff's Complaint,'" 924 So.2d at 4, sufficiently encompassed both plaintiff's claim for damages and its request for an injunction because the request for injunction "is a claim for relief made by the plaintiff in the pending action." Id. at 6.  First, the 1 Nation Technology Corp. decision entered on rehearing appears at odds with the Florida Supreme Court's prognostication in MGR Equipment Corp., 731 So.2d at 1264 n.2, 1265, that Rule 1.442, as revised in 1997, requires more particularity and greater detail in specifying claims to be included in the offer.  Second, there is no indication that acceptance of the offer analyzed in 1 Nation Technology, had any

27

ramifications beyond the tortious interference claims at issue in the same litigation. Finally, by its very recent admonition in <u>Nichols</u>, <u>supra</u>, the Florida Supreme Court has signaled that "settlement proposals must clarify which of an offeree's outstanding claims against the offeror will be extinguished . . . ." 2006 WL 1491542, at * 11.

Here, according to JTA, had Eby accepted the Proposal to settle and entered into the proposed Release, Eby would have forfeited its 299 day argument and at least part of its defense to JTA's liquidated damages claim.  However, this is not explicitly, or even  implicitly, stated in JTA's Proposal for Settlement or Release. The nonmonetary condition that JTA reads into its Proposal - that is, that Eby would receive <u>no</u> compensable or excusable days credit towards the contract's required completion dates - was not susceptible to meaningful evaluation by Eby.  <u>See</u> <u>Connell</u>, 866 So.2d at 92-93.

Furthermore, JTA's interpretation of the release provisions appear to go beyond what would be inherent in dismissal or release by operation of law upon a settlement and consent judgment.[10]  While a settlement agreement may specify the range of *claims* that are subject to preclusion, "settlements ordinarily occasion no *issue preclusion* (sometimes called collateral estoppel), unless it is clear . . . that the parties intend their agreement to have such an effect." <u>Arizona v. California</u>, 530 U.S.

_____

[10]      "A judgment entered pursuant to an offer of judgment may be analogized to a consent judgment, which is in the nature of a contract." <u>Security Professionals, Inc. v. Segall</u>, 685 So.2d 1381, 1383 (Fla. 4th DCA 1997).

392, 414 (2000)(emphasis in original).

> "In most circumstances, it is recognized that consent
> agreements ordinarily are intended to preclude any further
> litigation on the claim presented but are not intended to
> preclude further litigation on any of the issues presented.
> Thus consent judgments ordinarily support claim preclusion
> but not issue preclusion."  18 Charles Alan Wright, Arthur
> R. Miller, & Edward H. Cooper, Federal Practice and
> Procedure § 4443, pp. 384-85 (1981).  This differentiation
> is grounded in basic *res judicata* doctrine.  It is the general
> rule that issue preclusion attaches only "[w]hen an issue of
> fact or law is actually litigated and determined by a valid
> and final judgment, and the determination is essential to the
> judgment."  Restatement (Second) of Judgments § 27, p.
> 250 (1982).

Arizona, 530 U.S. at 414; see also Arizona, 530 U.S. at 417-18 (on the matter of

issue preclusion, the settlement was ambiguous).  Whether JTA's Proposal would

have actually precluded Eby from defending against JTA's subsequent claim for

liquidated damages is a matter for judicial interpretation, making the Proposal fatally

unclear and unenforceable.  See Hibbard, 918 So.2d at 971.

Moreover, JTA's argument that Eby's acceptance of the Proposal would have

precluded Eby from arguing compensable and excusable time as a defense to JTA's

pending claim for liquidated damages was first made clear at oral argument on this

motion, underscoring the ambiguity in the Proposal and Release.  JTA argues on the

one hand that its offer need not address the competition between Eby's claim for

compensable and excusable days versus JTA's claim for liquidated damages for

those same days, because its liquidated damages claim had not yet been asserted.

29

On the other hand, JTA contends that had Eby accepted its offer, the settlement of necessity would resolve the competing time claims in JTA's favor, because, according to JTA, Eby would be agreeing to no credit for any compensable or excusable days relating to the temporary structures claims.  Thus, although according to JTA, its liquidated damages claim was not ripe for adjudication at the time of its Proposal, the Proposal, if accepted, would nevertheless extinguish Eby's defense to at least part of JTA's "unripe" claim.  Nowhere was this clear.  What is certain, however, is that the full ramifications of Eby's acceptance of JTA's proposal are open for interpretation and debate.  The effect of Eby accepting JTA's Proposal for Settlement and Release cannot be determined without resort to clarification or judicial interpretation.  This alone invalidates the proposal.   See Nichols, 2006 WL 1491542, at * 10.

For these reasons, JTA's Proposal for Settlement and accompanying Release are ambiguous with respect to nonmonetary terms and conditions, and therefore unenforceable pursuant to Section 768.79, Florida Statutes.[11]

---

[11]     The Court need not reach the question of whether JTA made the Proposal for Settlement in good faith.  However, given the complexity of the contractual issues between the parties; the ongoing nature of these issues; the multiplicity of suits; and the difficulty in crafting a valid proposal for settlement under Section 768.79 and Rule 1.442 under these circumstances, the Court assumes that JTA did act in good faith.  Indeed, the Court notes that JTA offered $1.5 million to settle a case in which it ultimately prevailed.

For the foregoing reasons, and upon due consideration, it is hereby

**ORDERED:**

1.      Defendant Jacksonville Transportation Authority's Motion For Attorneys' Fees And Costs (Doc. 172) is **DENIED.**

2.      Defendant JTA shall file, by **July 28, 2006**, its application for costs pursuant to Rule 54(d), Federal Rules of Civil Procedure, as prevailing party.

3.      Plaintiff Martin K. Eby Construction Co., Inc. shall respond to JTA's application for costs by **August 15, 2006.**

**DONE AND ORDERED** at Jacksonville, Florida, this 7th day of July, 2006.


_____
**TIMOTHY J. CORRIGAN**
United States District Judge


j.
Copies to:
Counsel of Record